UNITED STATES of America, Appellant,

v.

ONE 1956 2–DOOR CHEVROLET, etc., Appellee.

UNITED STATES of America, Appellant,

v.

ONE 1957 FORD, etc., et al., Appellees.

Nos. 16183, 16184.

United States Court of Appeals Eighth Circuit.

Feb. 24, 1960.

Edward L. Scheufler, U. S. Atty., Joseph L. Flynn, Asst. U. S. Atty., Kansas City, Mo., for appellant.

Clifford H. Casey and William O. Russell, Joplin, Mo., for appellee, Bankers Investment Co.

Before JOHNSEN, Chief Judge, and SANBORN and VAN OOSTERHOUT, Circuit Judges.

JOHNSEN, Chief Judge.

One Hardesty and one Banfield had been charged, in the Western District of Missouri, with attemping to transport intoxicating liquor from Missouri to Oklahoma (then a "dry" State), in violation of 18 U.S.C. § 1262. On a trial without a jury, the court acquitted them of the charge, after suppressing as evidence the liquor involved, on the ground of illegal search and seizure.

The Government further had instituted forfeiture proceedings, under 18 U.S.C.A. § 3615, against the liquor and against a Chevrolet automobile belonging to Hardesty and a Ford automobile belonging to Banfield, which the Alcohol Tax Unit agents had seized in connection with the liquor. Each of the cars was at the time subject to a lien and right of possession in favor of a finance company, and these companies intervened in the proceedings to assert such rights. Banfield also intervened, seeking to have the liquor returned to him.

As to the lien on the Chevrolet, the Government conceded that its circumstances had been such as to entitle the finance company to mitigation, under 18 U.S.C.A. § 3617, of any forfeiture declarable against Hardesty. As to Banfield's Ford, however, the Government recognized no such right to remission or mitigation in favor of the lienholder, under the conditions of § 3617. And the liquor, of course, the Government contended was, from its alleged unlawful transportation, entirely contraband.

On a trial to the court of the proceedings, the evidence failed to satisfy the court that what Hardesty and Banfield were engaged in doing, when the seizures and arrests were made, was required or entitled to be regarded as representing an attemped transportation from Missouri to Oklahoma. It accordingly denied the Government any forfeiture relief and directed that the automobiles be turned over to the respective finance companies and that the liquor be returned to Banfield.

The Government has appealed. In view of its concession as to the lienholder's right to mitigation of any forfeiture relating to the Chevrolet, no challenge is here made against the court's order as to that car. Reversal only is sought of the court's denial of forfeiture as to the liquor and as to the Ford. Thus, the question for our determination is simply whether it was clearly erroneous for the court to refuse to find that the liquor was on the occasion involved being attempted to be transported from Missouri to Oklahoma and that the Ford was (under the language of § 3615) being "used in the transportation thereof".

Admittedly, all of the liquor when seized was contained in the Chevrolet, and no part of it was claimed to have ever been in the Ford. Banfield was driving the Chevrolet, and Hardesty was traveling behind him in the Ford. It was the Government's theory that Banfield was intending at some point to turn the Chevrolet over to Banfield and then drive off in the Ford, and that the Ford in accompanying the Chevrolet for this purpose was being "used in the transportation" of the liquor.

The Government's evidence showed that Banfield was the operator of a duly licensed Missouri liquor store, situated

on a highway several miles outside the city of Joplin in that State. Some three months before the incident which is here involved, he had admitted to an agent of the Federal Alcohol Tax Unit that he had been selling liquor to Oklahoma "haulers" and had made inquiry of the agent as to "how to show that on my records". Also, his purchases of liquor had for some months been considerably greater than was normal for such a liquor store as he was operating.

On the occasion here involved, just shortly before 9 o'clock p. m., a Tax Unit agent, who was keeping the liquor store under surveillance, saw some one get into the Ford, which was standing in front of the store, and drive off. Within a minute thereafter, the Chevrolet came out of a garage, which was attached to the rear end of the store, proceeded in the same direction as the Ford, and shortly afterwards passed around it on the highway. The route toward Oklahoma was westward from the store. The two cars traveled at all times in the opposite direction, toward the city of Joplin. One of the agents admitted in his testimony that "if you go east from his [Banfield's] store, you ultimately end up in the city of Joplin". Both cars so proceeded the entire distance and had entered the city limits of Joplin, when the agents engaged in stopping the vehicles.

The evidence showed that Hardesty was a resident of Oklahoma; and that his Chevrolet ws carrying Arkansas license plates. The Ford had Missouri license plates. Hardesty was reputed to be in the business of selling liquor in Oklahoma. But none of this had constituted a factor in the agents' stopping of the cars. The agents did not know to whom the automobiles belonged; had not observed what license plates they carried; and had no knowledge of who was driving either vehicle at the time they engaged in halting them in the city of Joplin.

All that the agents had seen was that the cars left Banfield's liquor store after business apparently was being terminated for the day, since the store was left

unlighted, and that one of the cars seemed to be heavily loaded. The cars proceeded in an ordinary course upon leaving the liquor store, straight toward the city of Joplin, with nothing in their movement or direction as such to suggest a seeming probability of unlawful transportation. They duly and openly entered the city of Joplin. And when they were stopped, the agents found that the cases of liquor which the Chevrolet contained were in plain view, part of them being piled next to Banfield in the front seat, and part of them being stacked in the rear-seat section of the car.

We do not feel legally entitled to say that these facts could not afford a basis for a trier of the facts reasonably to doubt, on preponderance balance as to the inferences which the Government sought to have drawn, whether this particular liquor was intended for and was being attempted at the time to be transported to Oklahoma. The circumstances were not without elements of evaluative substance for the court to conclude that it could reasonably be probable that the liquor involved was being taken into the city of Joplin for some other purpose.

Hauling liquor miles out of the way, in a diametrically opposite direction, over a highway leading to a city of approximately 40,000 population, onto the lighted streets of that city in the early evening, with the liquor piled unconcealedly on the front and back seats of the car, would not have to be accepted as representing normal probative earmarks of such an unlawful enterprise as the Government contended it should be inferred was being executed at the time.

Even if the court might have believed that Hardesty had perhaps come to Banfield's store and driven his car into the garage to obtain a supply of liquor to take to Oklahoma, it would still be open to it as the trier of the facts to be persuaded, we think, on the circumstances detailed and in relation to the fact of Banfield's driving of the car and his open entry into the city of Joplin, that it was no less conjectural for the inference to be made that these exposed cases

constituted such liquor, and that they were on the occasion involved being attempted to be transported to Oklahoma, than to infer that Hardesty had allowed Banfield to take advantage of the immediate convenience of the Chevrolet in the garage to load and haul the particular liquor to Joplin for some other purpose.

The Government calls attention to the fact that one of the agents stated in his testimony that a "tape" was taken from Hardesty. As the trial court pointed out, however, it was not attempted to be shown that by this was meant a sales register tape, or, if so, that it was one from Banfield's store, or that, even if such had been the situation, there was anything on the tape to indicate identification or relationship to the particular liquor.

But it is further contended by the Government that the court improperly failed to take into account, in arriving at its conclusion, some admissions which one of the agents testified had been made by Banfield at the time of the stoppage, seizure and arrest. The agent testified that the following conversation occurred between him and Banfield:

Q. "Frank, why do you stick your neck out like this?"

A. "I don't know, I guess I don't know any better."

Q. "How far do you ordinarily go with these fellows?"

A. "About two miles."

Q. "Why don't you let them start from your store?"

A. "I don't know, I don't believe I ought to be in this business."

The court recited in its memorandum and order the substance of the first two of these questions and answers. We think it plain from the nature of the memorandum and order that the court regarded the third question and answer as not containing any additional affective substance beyond that which it had generally summarized, and that it cannot be said, in the appraisal which it made of this aspect of the situation, to have ignored a part of the Government's evidence. In fact, the court recognizingly stated: "Hardesty's residence, and Banfield's statements, may create a suspicion that ultimately the liquor in question would have reached Oklahoma, but doesn't at the time of the search and seizure and subsequent arrest of Banfield and Hardesty, establish that they were then actually engaged in attempted transportation of liquor that can be declared contraband." Thus, the court regarded the conversation as not constituting or implying any such intended or direct admission in respect to the particular transportation as to be persuasive of violation, or in overall consideration to require such an appraisal of what had been done in the situation, with its lack of objective elements of seeming probability at the time.

In relation to the trial court's appraisal, it may be observed that the district judge involved (Judge Ridge) has had many years of experience in dealing with the problem of attempted liquor transportation from the Joplin area to Oklahoma. He has carefully and responsibly engaged in evaluation of these situations on their particular circumstances, as our records manifest. Smith v. United States, 8 Cir., 264 F.2d 469, and McCarthy v. United States, 8 Cir., 264 F.2d 473, are recent examples where we have had occasion to uphold his judgment in situations of this character.

The present situation was one where he felt compelled to draw the line on the basis on which the agents had acted. We think the recent decision of the Supreme Court in Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134, lends support to the conclusion which he reached. In any event, even if a different result could have been reached, there is in our opinion sufficient ground in the evidence to permit of his viewing the situation as one of doubt and conjecture in relation to the particular transportation, so that we would not be warranted in declaring that a contrary persuasion was convictionally required, and that the conclusion involved was therefore clearly erroneous.

In view of the general basis on which the court rested its result, consideration is of course not necessary of whether the Ford could legitimately be found to have been "used in the transportation" of the liquor, within the meaning of 18 U.S.C.A. § 3615, as related to the views expressed in such cases as United States v. Lane Motor Co., 344 U.S. 630, 73 S.Ct. 459, 97 L.Ed. 622; First National Bank of Atlanta v. United States, 5 Cir., 249 F.2d 97; and United States v. One 1956 Ford Tudor Sedan, 4 Cir., 253 F.2d 725.

For the reasons which have been set out, the judgments are affirmed.